PATRICIA A. BOWEN ET AL. *v.* ANTHONY J.
SERKSNAS ET AL.
(AC 30707)

Flynn, C. J., and Robinson and Alvord, Js.*

---

* The listing of judges reflects their seniority status on this court as of
the date of oral argument.

Argued February 8—officially released June 8, 2010

*Neil R. Marcus*, with whom were *Barbara M. Schellenberg* and, on the brief, *Austin D. Kim*, for the appellant-appellee (named plaintiff).

*Frank C. White, Jr.*, for the appellees-appellants (defendants).

FLYNN, C. J. The plaintiff Patricia A. Bowen, (Patricia) appeals from the judgment of the trial court finding that she and her brother, Walter V. Bowen (Walter) did not establish their claim of adverse possession against the defendants, Anthony J. Serksnas and Marnie L. Serksnas.[1] The defendants filed a cross appeal claiming several missteps by the court. Because we conclude that the court properly found that the facts did not demonstrate that Patricia and Walter successfully had proven their claim of adverse possession, we need not address the merits of the defendants' cross appeal or whether a cross appeal was proper under Practice Book § 61-8 when the defendants were successful at trial. Accordingly, we affirm the judgment of the trial court.

The following facts, as found by the court, are relevant to our resolution of this appeal. "The dispute is over portions of adjoining lots 36 and 37. These properties are located at 8 DeRenne Road and 10 DeRenne Road, respectively, in Old Saybrook. The defendants acquired the lots by warranty deed from Elinor [DeRenne] and Charles DeRenne. The transfer occurred on April 19, 2006. . . . The Serksnas[es] also own lot 35. Patricia and Walter Bowen own the neighboring property, lot 38. Their property is located at 5 Elinor Road in Old Saybrook. These lots are part of a common subdivision for seasonal use.

"The Bowens jointly claimed that they have used certain portions of lots 36 and 37 since 1965 without consent. They contend that their conduct has been open, visible and continuous for over fifteen years. Thus, they asked [the] court to quiet title in their favor. Patricia Bowen testified at trial about her adverse use of the property. Walter Bowen did not testify. [The

---

[1] Walter was also a plaintiff at trial. He has not appealed from the judgment of the court, however. Therefore, Patricia is the sole plaintiff in this appeal.

Bowens'] other evidence included photographs and expense records showing that Patricia Bowen paid to maintain portions of lots 36 and 37.

"The Serksnas[es] also testified at trial and provided photographs and other documents to challenge [the Bowens'] claim. Their central rebuttal was that [the Bowens] have failed to make a clear and positive claim over any part of the disputed lots. Alternatively, they argued that the Bowens had permission, consent or license to use the properties while they were maintained." (Citation omitted.)

On the basis of the evidence presented and the credibility of the witnesses, the court found that the Bowens had not proven open and visible use of a positively identified area of the lots, notorious and hostile possession or that they had acted under a claim of right. Accordingly, the court found that the Bowens had not proven their adverse possession claim and rendered judgment in favor of the defendants. Patricia now appeals. Additional facts will be set forth where necessary.

Patricia claims that the court improperly concluded that she and Walter failed to establish the facts necessary to support their claim of adverse possession. Specifically, she argues that the court improperly found that they had failed to prove open and visible use, hostility, and exclusive use without shared dominion and that they possessed the subject lots under a claim of right. The defendants argue that the court properly found that the Bowens had failed to prove their claim of adverse possession. We agree with the defendants.

"[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own

and without the consent of the owner. . . . A finding of adverse possession is to be made out by clear and positive proof. . . . The burden of proof is on the party claiming adverse possession. . . . Despite that exacting standard, our scope of review is limited." (Internal quotation marks omitted.) *Woodhouse* v. *McKee*, 90 Conn. App. 662, 669, 879 A.2d 486 (2005). "Because adverse possession is a question of fact for the trier . . . the court's findings . . . are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Internal quotation marks omitted.) *Eberhart* v. *Meadow Haven, Inc.*, 111 Conn. App. 636, 641, 960 A.2d 1083 (2008).

In this case, the court found that the Bowens had failed to establish a prima facie case of adverse possession. In fact, the court found that the Bowens had failed to establish any of the elements of an adverse possession claim. On appeal, Patricia claims that the court's findings were clearly erroneous and that she and Walter had established a prima facie case. We do not agree.

Rather than analyze every element of the plaintiff's adverse possession claim as did the trial court, we will focus our analysis on what we consider to be the most fatal flaws in Patricia's claim on appeal, namely, the court's finding that the Bowens did not use these lots exclusively without shared dominion and the acknowledgment of superior title in letters written by Walter.

The court specifically found: "The question of exclusive use deals another damaging blow to the Bowens' claim because innumerable others shared dominion over the lots. . . . It is clear from the testimonies that the DeRennes used their lots infrequently. Yet, the court must note that essentially these lands are for seasonal use. As such, any seasonal use by the DeRennes or others would negate the Bowens' exclusive possession.

"The DeRennes' generosity may have instigated the plaintiffs' adverse intentions. But that same virtue invited several users to the property to prevent the Bowens' adverse possession. For example, Maxine Byrnes testified that she cleared brush and trimmed rose bushes to maintain parking space on lot 37. Others in her family kept the horseshoe pit that the Bowens enjoyed on their picnics. [Byrnes'] family used the lots from the 1960s and well into the 1980s. [The defendants] gave similar testimonies.

"More importantly, the DeRennes entered the properties at their pleasure. Charles DeRenne testified that he visited the lots on several occasions in the 1970s. He met Walter . . . during some of these visits, but he was never asked to leave the properties. Elinor DeRenne also testified that she consistently went to the lots. She even permitted Yale students to conduct research at the marsh on lot 36. As a true owner, Elinor DeRenne paid the property taxes until title passed on to the [defendants] in April, 2006." (Citations omitted.)

As explained by our Supreme Court in *Roche* v. *Fairfield*, 186 Conn. 490, 502–503, 442 A.2d 911 (1982): "In general, exclusive possession can be established by acts, which at the time, considering the state of the land, comport with ownership; viz., such acts as would ordinarily be exercised by an owner in appropriating land to his own use and the exclusion of others. . . . Thus, the claimant's possession need not be absolutely

exclusive; it need only be a type of possession which would characterize an owner's use. . . . It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question." (Citations omitted; internal quotation marks omitted.) "The use is not exclusive if the adverse user merely shares dominion over the property with other users." (Internal quotation marks omitted.) Id., 498; see also *Arcari* v. *Dellaripa*, 164 Conn. 532, 536, 325 A.2d 280 (1973) ("[t]he requisite of exclusive possession for the statutory period is not met if the adverse user merely shares dominion over the property with other users"); *Lisiewski* v. *Seidel*, 95 Conn. App. 696, 702, 899 A.2d 59 (2006) ("[i]f dominion is shared, then the exclusivity element of adverse possession is absent").

In *Short Beach Cottage Owners Improvement Assn.* v. *Stratford*, 154 Conn. 194, 199, 224 A.2d 532 (1966), the plaintiff claimed, inter alia, that it had acquired an area of beach front property by adverse possession. The trial court found, however, that the plaintiff had not maintained exclusive use of the property. Id. The Supreme Court agreed with the trial court, explaining: "One of the requisites to acquiring property by adverse possession is that the claimant maintain an exclusive possession of the disputed area during the running of the fifteen-year period. . . . This condition is not met if the adverse user merely shares dominion over the property with other users. . . . Since the referee found as a fact that the [plaintiff's predecessors in title] never maintained an exclusive possession over the beach area, in that others occupied cottages on the property without the [predecessors'] permission, the conclusion that the plaintiffs failed to establish title by adverse possession was required. In addition, the [predecessors] did not collect rents for the cottages established on or

moved to the subject property. This is inconsistent with a claim of title by adverse possession." (Citation omitted.) Id.

In the present case, the court found that the DeRennes had given broad privilege to many of their neighbors to use the lots in question as long as the neighbors kept the lots well maintained.[2] The court specifically pointed to the testimony of Byrnes that she and her family used and maintained areas of these lots from the 1960s to the 1980s.[3] The defendants also testified that they, too, had similar experience with the use of the lots.[4] Patricia

[2] Elinor DeRenne testified that between 1965 and 2006 she occasionally went to lots 36 and 37. She took people from the town offices there to show them the property when she was appealing an increase in her property taxes. She filed tax appeals on the lots three or four times. She also went there with her sister to go swimming and with her brother when he was visiting the area. She never saw anyone using the lots when she went there, not even for parking. She estimated that she went there once per year. Elinor DeRenne also testified that she gave J. Kevin Kinsella, a neighbor at Chalker Beach, permission to enter the land to trim or cut down some trees. Anthony Serksnas also had permission to trim and cut trees.

[3] The record reveals that Byrnes testified that she and her husband, Jack Duggan, owned the property at 7 DeRenne Road, lot 35, which previously had been owned by Jack Duggan's parents, who had purchased it from Charles DeRenne, and that the property is now owned by their daughter, Marnie Serksnas, formerly Marnie Duggan, and her husband, Anthony Serksnas, the defendants in this case. Lot 35 is across the street from lots 36 and 37. Byrnes testified that she spent every summer at lot 35 and that she still frequents the property and still parks on lot 37. Byrnes stated that she has been going to these properties since 1964, and lot 37 has been used by her family and friends for overflow parking since that time. In the 1970s, Duggan and his father reconstructed the horseshoe pit on lot 37, and they then used lot 37 for horseshoes and lots 36 and 37 for family picnics nearly every weekend. Byrnes testified that other neighbors also used the horseshoe pit regularly and that some of them also picnicked there. These picnics lasted well into the 1980s, and the children also played ball on these lots. Byrnes testified that she never saw Walter or Patricia at these picnics and that she never saw them park their vehicles on either lot 36 or 37, although she did see them on their own property, lot 38, where they also parked their vehicles. Byrnes further testified that she performed maintenance on lots 36 and 37, trimming and cutting back the rambling roses.

[4] Marnie Serksnas testified that she grew up at lot 35 and that her grandfather, John Duggan, owned the property before she was born. She played on lots 36 and 37 throughout her childhood, playing football, baseball and horseshoes, and her family and the neighbors also picnicked there. She

makes much ado about receipts that she kept that alleg-
edly showed how much she spent toward the mainte-
nance of lots 36 and 37. The fact that she may have
paid a service company to maintain the lots, rather than
maintain them herself in exchange for being able to use
them, does not demonstrate exclusive dominion. In fact,
our own review of the record shows no evidence that
the Bowens used the lots in any manner inconsistent
with the use afforded to and accepted by other
neighbors.[5]

The court also made other relevant findings of fact:
"The Bowens made no . . . affirmative showing of
hostility. They used the lots in the manner permitted
by the DeRennes, not as notorious adverse possessors.
Indeed, Walter Bowen's actions are especially telling
on this point. He offered to purchase the lots, not only
for himself, but also as his sister's agent, albeit without
her authorization. It is well established that 'an attempt
to purchase legal title . . . is recognition of that title.'
*Allen* v. *Johnson*, 79 Conn. App. 740, 746, 831 A.2d 282,
cert. denied, 266 Conn. 929, 837 A.2d 802 (2003). So, in

remembered her family parking on lot 37 all the time, and other neighbors
parked there as well. Neighbors entered the marsh on lot 36 to crab or to
kayak, and she took her brother crabbing in the marshland. Marnie Serksnas
also testified that she never saw Walter or Patricia on lots 36 or 37 but that
she did see Walter park on lot 37 occasionally.

Anthony Serksnas testified that he began going to lots 35, 36 and 37 in
the summer of 1987 when he began dating Marnie and that he continued
going there with her in the summers. He stated that he parked on lot 37
and that "[t]hose lots were used by everybody at the end of the streets for
overflow parking primarily." Additionally, Anthony Serksnas testified that
in 2000 or 2001, he began constructing a new porch on lot 35 and that he
contacted Elinor DeRenne for permission to partially clear some portions
of lots 36 and 37 to enhance his view and to provide better access to the
marshlands, and that she gave him such permission. The Kinsellas then
contacted the DeRennes to get permission for further clearing, and he and
the Kinsellas split the cost of the continued maintenance of the enhanced
views. He also testified that neighbors then crossed the lots to get to the
marshlands to kayak.

[5] Furthermore, Patricia testified that other neighborhood residents also
used lots 37 and 38 since 1964.

attempting to purchase the properties from the true owners, Walter Bowen acknowledged the DeRennes' superior title. This contributes substantially toward negating the Bowens' adverse disposition and claim of right."

"[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and *without consent* of the owner." (Emphasis added; internal quotation marks omitted.) *Chuckta* v. *Asija*, 97 Conn. App. 232, 235, 903 A.2d 243 (2006). Furthermore, "[a]n adverse possessor may interrupt his or her continuous possession by acting in a way that acknowledges the superiority of the real owner's title. . . . [T]he possession of one who recognizes or admits title in another, either by declaration or conduct, is not adverse to the title of such other. . . . Occupation must not only be hostile in its inception, but it must continue hostile, and at all times during the required period of fifteen years challenge the right of the true owner, in order to found title by adverse use upon it. . . . Such an acknowledgment of the owner's title terminates the running of the statutory period, and any subsequent adverse use starts the clock anew. (Citations omitted; internal quotation marks omitted.) *Allen* v. *Johnson*, supra, 79 Conn. App. 746–47.

Prior to 1965, Eudora DeRenne[6] owned several lots in Old Saybrook, including lots 36, 37 and 38. In January, 1965, she conveyed lot 38 to Ellen Bowen, the mother of Walter and Patricia, expressly telling Ellen Bowen that the Bowens could use lots 36 and 37 if they maintained those lots. Walter was present at the closing and expressly heard Eudora DeRenne tell his mother, Ellen

---

[6] Eudora DeRenne was Charles DeRenne's wife and died in 1971.

Bowen, that "if you people maintain the land, you can use the land." Nevertheless, in a March 24, 1980 affidavit, filed on the land records just fifteen years after the January, 1965 closing, Walter averred that he exclusively had adversely possessed these lots for the requisite fifteen year period. Another affidavit filed by Patricia on May 23, 1980, expressly stated that she exclusively had adversely possessed these lots for the requisite fifteen year period.[7] Elinor DeRenne never saw the affidavits filed by Walter and Patricia, and Charles DeRenne did not see them until 2005. Both of these affidavits purportedly were filed pursuant to General Statutes § 47-12a. In accordance with the averments in these affidavits, the alleged adverse possession of lots 36 and 37 by Patricia and Walter would have begun at or near the time their mother purchased that lot from Eudora DeRenne and received express permission from Eudora DeRenne to use neighboring lots 36 and 37 on the condition that the family maintain those lots. Both Walter and Patricia acknowledged that they knew that their mother had been given permission to use lots 36 and 37 at the time she had purchased lot 38.[8]

---

[7] Both of these affidavits were filed in response to a notice to prevent claim of easement, pursuant to General Statutes §§ 47-38 and 47-39, filed by Elinor DeRenne on January 14, 1980. The court, however, determined that this notice was not served in accordance with the statutes and that it, therefore, was ineffective. We need not discuss the propriety of this ruling in this appeal.

[8] Patricia testified at trial that although she was not present at the closing when her mother purchased lot 38 from Eudora DeRenne, she was told that her mother was given permission to use lots 36 and 37, provided she maintained those properties. She also answered, "Oh, yes," when asked whether she "maintained lot 37 . . . after [she] had heard that [Eudora] DeRenne had provided permission to [her] mother and the Bowens to use lot 36 and 37 if they maintained it."

Walter did not testify at trial, but he did admit via a September 17, 2005 letter, which we will discuss, that he was present at the closing when Eudora DeRenne gave permission to his mother to use the properties. Patricia admitted during cross-examination that although she did not authorize Walter to send this letter on her behalf, she did not disagree with the contents of the letter.

In their amended complaint, Walter and Patricia alleged that they jointly had adversely possessed lots 36 and 37 for the requisite fifteen year period. The alleged starting point of their adverse possession of these lots is somewhat unclear, however. The complaint references the 1980 affidavits, which indicates that the possession would have started in or before 1965, at the time they both acknowledge that their mother, the then owner of lot 38, had been given express permission to use lots 36 and 37 if she and her family maintained those lots, but the plaintiff also indicates in her appellate brief that the adverse possession may have started in the early 1970s after the deaths of Ellen Bowen and Eudora DeRenne; on January 14, 1980, when Elinor DeRenne filed a notice on the land records to prevent a claim of easement; or "from 1990 onward [when] Maxine Byrnes and her family were not participating in any significant activity on lots 36 and 37."[9]

Nevertheless, in a September 17, 2005 handwritten letter, which Walter sent to Charles DeRenne in response to a letter that Charles DeRenne had written to the Bowens concerning the parking of vehicles on a portion of lot 37 and a statement that Walter allegedly had made to a neighbor, J. Kevin Kinsella, that he owned lot 37, Walter stated: "When your [m]other closed on this property in 1965, she stated to my [m]other, with me present, '[i]f you people maintain the land, you can

---

[9] Patricia testified, however, that prior to 1980, when she received the notice to prevent a claim of easement, she had not thought about using lots 36 and 37 as her own or about acquiring ownership of them:

"[The Defendants' Counsel]: Ma'am, when you were using lots 36 and 37, did you intend to use them with the goal of acquiring them and owning them?

"[Patricia]: We were just using them.

"[The Defendants' Counsel]: You never thought about it? I'm only speaking about you because you're the only one who's testifying. When you were using those lots, were you thinking about using them and acquiring ownership of them?

"[Patricia]: Not until 1980 . . . [when] [w]e received the notice of easement . . . ."

use the land.' My [m]other was unaware until that day of the closing that this strip of land was not included in the sale, especially, since the leach fields, however long they are, extended into that strip of land from the septic tank system. However, your [m]om stated she wanted the land so she [and] family members could picnic and use the beach which she did twice. On each occasion, my [m]om offered your [m]om and companions use of the bathrooms, and outside showers which they gladly accepted.

"For forty years now, my [m]other who is deceased thirty years, Patricia and I have maintained this strip of land, which has our leach fields on it, with the help of Parker Lawn Service . . . who cleans, prunes, rakes and mows [in the] spring, summer and fall with all expenses being paid by us. Presently, we're under contract with Bombaci Tree Care . . . to remove two dangerous large thick split limbs that are hanging from two trees on that land. The cost that Patricia and I are paying is coming to $550.00, and because we maintain [and] use the land we have no problem assuming the expense, and not bothering Elinor [DeRenne].

"The Duggans and their extended family have always used that land for parking for years, and as recently as last week without any problems. Mr. Kinsella's [modus operandi] is, he doesn't want *anyone* parking there because . . . it interferes with his view of the marsh. Did Mr. Kinsella (the man with the camera), mention to you he had mature trees cut down . . . to enhance his view? I had told him I had no authority to give the [okay] when he asked. He had it done in the winter when no one was around. The man wants what he wants, and he'll leave no stone unturned.

"Many years ago, your sister Elinor [DeRenne] called me . . . and offered a package deal of two roads, Elinor [and] DeRenne, and along with [two] lots. One lot

was in the marsh, protected by the Wetlands Act. The only lot we would have been interested in was the strip of land where our leach fields are [and] it was land we were already maintaining.

"To be honest, at that time we didn't have the money to purchase other real estate. We have had forty wonderful years here, along with the usual sadnesses that all families experience. My goal in retirement is to remove as much stress as possible in my life, and the man with the camera, who had nothing better to do but make waves, will not interfer[e] with that goal.

"The land has not been abused, and it looks good, as it always does. The next time you're in [Connecticut] stop by, [and] hopefully, I will be here.

"I'm sorry you [and] Elinor [DeRenne] had to be bothered with this nonsense, since we have co-existed very nicely for a long, long time, along with our neighbors on this lane. I hope you are in a safe location from this Ophelia. Walt Bowen—[telephone number] Patricia Bowen—[telephone number]."[10]

On September 27, 2005, Charles DeRenne sent another letter, addressed to Walter and Patricia, advising them that the DeRennes had offers to purchase lots 36 and 37, to which Walter sent the following handwritten response: "I sincerely hope that these communications are not bothersome to you [and] your family. I only recently looked at the field cards at [t]own [h]all in Old Saybrook, and I can see why Mr. Serksnas would be interested in purchasing lot 36 since his property and yours abut each other, and that is why Patricia and I would also be interested in purchasing lot 37 that abuts our property as well.

---

[10] Patricia testified that she did not authorize Walter to send this letter on her behalf but that she did not disagree with the letter.

"If you, Elinor [DeRenne] and family decide in the future to sell the property, I would only hope you would consider us first since we have a history on the land. Since retirement, I winter in Florida from December 1st to mid June . . . .

"Hopefully, everything can be resolved in the positive for you, Elinor [DeRenne and] family, as well as for Mr. Serksnas, and of course, the Bowens."[11]

Although Walter is not a party to this appeal, the adverse possession claim he and Patricia brought was a joint claim of possession. In their complaint, they alleged that they performed all the actions necessary to establish a prima facie case of adverse possession, and they asked the court to quiet and settle title in them. They also presented as evidence the two separate affidavits, one sworn to by Walter and one sworn to by Patricia, each of which was filed separately on the land records between March 24 and May 23, 1980. Walter's affidavit stated that he, exclusively, had adversely possessed the relevant lots for the requisite fifteen years, and Patricia's affidavit stated that she, exclusively, had adversely possessed the relevant lots for the requisite fifteen years. Neither affidavit mentioned the other. In their complaint, however, the Bowens alleged that they adversely possessed the lots together. Nevertheless, Walter's letters to Charles DeRenne, with which Patricia had no disagreement, recognized the superior title of the DeRennes and clearly admitted that the use of these lots had been permissive since 1965. Therefore, the Bowens' joint claim of adverse possession necessarily

---

[11] Patricia testified that she did not authorize Walter to send this letter on her behalf, nor did she see any need to confront him after he had sent the letter and that she did not disagree with the content of the letter. She also stated that in October, 2005, she and Walter were interested in purchasing the properties and that "[i]ntermittently over the years, there have been conversations about purchasing the land."

fails, especially when the court credited these admissions and accorded them such significant weight.[12] On appeal, we do not discount the weight afforded such admissions by the trial court simply because Walter, who made the admissions, is not a party to the appeal.

Clearly, each of the letters written by Walter expressed his recognition that the Bowens' use of these lots was permissive since 1965 and that the DeRennes owned the lots at least as of the date of the letter, September 27, 2005, thus defeating any claim that he had adversely possessed these lots, either jointly or severally, prior to his filing of the adverse possession affidavit on the land records or at any time thereafter. Although Patricia argues that "even if Walter Bowen could not prevail on his adverse possession claim

---

[12] We need not determine for purposes of this appeal whether these were judicial admissions or evidentiary admissions, the court having credited them with significant weight. "Judicial admissions are voluntary and knowing concessions of fact by a party or a party's attorney occurring during judicial proceedings. . . . They excuse the other party from the necessity of presenting evidence on the fact admitted and are conclusive on the party making them. . . . The statement relied on as a binding admission [however] must be clear, deliberate and unequivocal. . . . Whether a party's statement is a judicial admission or an evidentiary admission is a factual determination to be made by the trial court. . . . The distinction between judicial admissions and mere evidentiary admissions is a significant one that should not be blurred by imprecise usage. . . . While both types are admissible, their legal effect is markedly different; judicial admissions are conclusive on the trier of fact, whereas evidentiary admissions are only evidence to be accepted or rejected by the trier. . . . In contrast with a judicial admission, which prohibits any further dispute of a party's factual allegation contained in its pleadings on which the case is tried, [a]n evidential admission is subject to explanation by the party making it so that the trier may properly evaluate it. . . . Thus, an evidential admission, while relevant as proof of the matter stated . . . [is] not conclusive. . . . Because the probative value of an admission depends on the surrounding circumstances, it raises a question for the trier of fact. . . . The trier of fact is free to give as much weight to such an admission as, in the trier's judgment, it merits, and need not believe the arguments made regarding the statement by one side or the other." (Citations omitted; internal quotation marks omitted.) *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, 112 Conn. App. 511, 523 n.5, 963 A.2d 676 (2009).

because of his actions, those actions should not prevent Patricia Bowen from prevailing on her claim," the fact is Patricia and Walter brought a complaint alleging that they had jointly possessed these lots. Although Walter is not a party to this appeal, he was a plaintiff at trial and, therefore, a party capable of making admissions. The complaint alleged joint adverse possession, which, clearly, was not proven, the court finding quite significant Walter's admissions in the two letters that he wrote to Charles DeRenne. Furthermore, Patricia stated on more than one occasion at trial that she did not disagree with the letters or their content.

Additionally, the court made further relevant findings: "The Bowens' claim of right issue relates invariably to whether the DeRennes acquiesced, consented or gave permission [to use the lots]. It is abundantly clear . . . that the DeRennes gave all three forms of privilege to their neighbors liberally. Patricia Bowen was granted permissive use of lots 36 and 37 as long as she maintained the properties. This inter-familiar use extended back to 1965. [Patricia and Walter] never paid taxes, the association assessment, nor insurance for lots 36 and 37. Elinor DeRenne paid the taxes and the [a]ssociation dues on the lots from 1965 until she sold the lots to [the] Serksnas[es] on April 19, 2006. Patricia Bowen acknowledged that the Bowens were granted broad privileges over lots 36 and 37. Her state of mind obviates an adverse possession analysis." Our own review of the record in this case leads us to the conclusion that the court's findings have evidentiary support and, therefore, are not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.