### ROSEMARY ARAMONY *v.* DISTRICT OF CHAPMAN BEACH
### (AC 34473)

Beach, Bear and Borden, Js.

---

Argued May 29—officially released July 30, 2013

*Richard D. Carella*, with whom was *David R. Makarewicz*, for the appellant (plaintiff).

*Matthew Ranelli*, for the appellee (defendant).

*Opinion*

BEAR, J. The plaintiff, Rosemary Aramony, appeals from the judgment of the trial court finding in favor of the defendant, the district of Chapman Beach (district), on the plaintiff's claim of adverse possession. On appeal, the plaintiff claims that the court incorrectly concluded that she had not established her adverse possession claim. We affirm the judgment of the trial court.

The following facts, as found by the court after a seven day trial, and procedural history aid our review of the plaintiff's appeal. The plaintiff's grandparents,

John L. Annino and Mary M. Annino, purchased a seasonal cottage, located along Long Island Sound, at 73 Chapman Avenue in Westbrook, in 1947 (lot 3). Since that time, lot 3 has remained in the plaintiff's family, and she now holds title to it. On March 25, 2008, the plaintiff brought this action to quiet title to approximately 1531 square feet of land located immediately south of and adjacent to lot 3 (disputed area). The district is the current record owner of the disputed area.

Specifically, the trial court found as follows: "[A] 2006 survey map shows the disputed area as land to the south of [l]ot 3 and abutting a beach area and Long Island Sound. The southerly boundary of [l]ot 3 is established by a series of bound stones. . . . The bound stones are described on [a] January 31, 2006 survey map as 'BOUNDARY POINTS LABELED "B-STONE" ARE ROUGH CUT STONES WITH LETTER "B" CHISELED ON TOP. CENTER OF "B" WAS USED FOR LOCATION.' . . . The disputed area appears as a portion of the lawn of [l]ot 3. Lot 3 is bordered on the east by First Avenue and north by Chapman Avenue, and to the west by lots 4, 5, 6 and Second Avenue. . . .

"At the southern end of the disputed area adjacent to First Avenue there is a stone and concrete wall. Going north there are three stone and mortar pillars. A hedgerow then extends up along First Avenue. The hedgerow runs along the east boundary of [l]ot 3 and the disputed area. . . . Since 1947, the plaintiff and her predecessors in title have trimmed the hedge. The hedgerow was present when the property was first acquired in 1947 by the plaintiff's grandparents. The stone pillars and hedgerow predate 1923. . . . The plaintiff has no knowledge of why the hedgerow was planted along her property and the disputed area. Likewise, she does not know why the pillars were constructed. The pillars do not inhibit pedestrian traffic. A map recorded on the Westbrook land records in April,

1933, depicts the pillars and Cedar Avenue. . . . The map identifies the pillars and discloses their purpose with the following notation: 'Street closed at this point with concrete posts.' . . .

"Over the years, the hedge has grown in size, been cut back and grown again. There was a point in time when the hedgerow completely covered the third pillar to the north of Long Island Sound. For a period of time, a wooden gate existed between the first and second pillars. The gate was constructed of slats of wood and with relatively large spaces between these slats. . . . The gate had a hook and eye and later a latch. The gate could be easily opened from either side by reaching through the slats and disengaging the hook or latch. The gate was removed sometime in the mid-1970s. It is unclear who built the gate and when it was put in place. The disputed area is accessible to persons from [l]ot 3, First and Second Avenues and the beach.

"The chain of title to [l]ot 3 is not in dispute. . . . On August 18, 1906, Charles Chapman conveyed the parcel to Mary Lohmes. . . . The property was next conveyed by an administrator's deed of the estate of Mary Lohmes to Rena L. Martinson, Florence L. Shepard and Olive L. Proper dated March 7, 1936. . . . Thereafter it was conveyed by the aforementioned grantees to Warren A. Willard by deed dated December 21, 1943. . . . Thereafter, on April 2, 1947, Willard conveyed the property to John L. Annino and Mary M. Annino. The Anninos were the plaintiff's grandparents. . . . On July 2, 1954, John L. Annino quitclaimed his interest in the property to his wife Mary M. Annino. John L. Annino died in 1954. . . . On September 9, 1981, Mary M. Annino conveyed the property to her three surviving children, Sebastian M. Annino, John L. Annino, Jr., and Rose Marie Paguni. . . . At the time of the transfer, Mary M. Annino was in her early eighties. Rose Marie Paguni was the plaintiff's mother. On August 29, 1982,

Sebastian M. Annino and John L. Annino, Jr., conveyed their interest in the property to Rose Marie Paguni. . . . In 1988, [Rose Marie] Paguni was diagnosed with a life threatening illness and as a result on October 5, 1988, she quitclaimed her interest to her husband Philip A. Paguni and herself jointly with survivorship. . . . [Rose Marie] Paguni died on April 8, 1989. [Philip] Paguni then became the sole owner of the parcel. . . . The plaintiff had several siblings. Her sister died in December, 1986. Her brother, Anthony Paguni, currently resides in Meriden, Connecticut. Beginning on December 30, 1996, Philip Paguni began to divest himself of the property by conveying an undivided one twenty-fifth interest to the plaintiff and Anthony Paguni. . . . These conveyances were repeated each year in 1997 through 2000. [Philip] Paguni died on October 28, 2001. In 2001, [he] had not conveyed any further interest in the property to his two children.

"The plaintiff and her brother were coexecutors of their father's estate. On January 31, 2003, through an executor's deed, the plaintiff and her brother conveyed the property to themselves as tenants in common. . . . Finally, on that same day, Anthony Paguni transferred his interests in the property to the plaintiff making her the sole owner of 73 Chapman Avenue, Westbrook, Connecticut. . . .

"The legal description of the property has not changed from 1906 to the present day as it pertains to the disputed area and the size of [l]ot 3. It is described as: A certain piece or parcel of land together with the summer cottage and garage thereon, same being situated in the [t]own of Westbrook, [c]ounty of Middlesex and [s]tate of Connecticut, and being a certain cottage lot at Cedar Crest, near Chapman Beach, in the southeasterly part of the [t]own of Westbrook, known as lot No. 3 (as per chart on file in the [t]own [c]lerk's [o]ffice) bounded as follows:

"NORTHERLY: by Chapman Avenue;

"EASTERLY: by First Street;

"SOUTHERLY: by Cedar Avenue and

"WESTERLY: by land now or formerly of Angelina Saraceno, known as lot No. 4; together with the right to pass and repass to and from the water fronting said lot. The above described lot is fifty (50) feet front by one hundred (110) [sic] feet deep. The [g]rantee is restricted from placing any buildings on said lot nearer than eight (8) feet of the south line of the above described premises.

"The legal description in all of the deeds referenced [previously] do not include the disputed area. This includes the January 31, 2003 executor's deed signed by the plaintiff and her brother. . . .

"The reference to 'chart on file in the [t]own [c]lerk's [o]ffice' in the deeds is to a document entitled '[m]ap of [c]ottage [l]ots at Cedar Crest Westbrook, Conn. C.E. Chapman [p]roprietor.' . . . The map depicts twelve lots. Lot 3 is shown as being bounded by First Avenue to the east, Chapman Avenue to the north and Cedar Avenue to the south. The portion of Cedar Avenue abutting [l]ot 3 is the disputed area. Beyond Cedar Avenue, and to the south is the beach and Long Island Sound. Lot 3 is shown as being 110 feet north-south and 50 feet east-west. The depiction on the map corresponds with the property description in the deeds. Specifically, the map indicates that [l]ot 3 is bounded to the south by Cedar Avenue, and is 50 x 110 feet in size. As previously stated, the deed restricts the placement of any buildings within eight feet of the southerly border with Cedar Avenue. The grantees have complied with that restriction. The grantees in the chain of title have an easement to Long Island Sound. The deeds state, 'together with

the right to pass and repass to and from the water fronting said lot.' . . .

"Cedar Avenue was not a public road, rather it was owned by Charles Chapman. In 1916, Chapman began to convey portions of Cedar Avenue to the abutting property owners. These lots were located to the west of Second Avenue. . . . The effect of this was that these property owners now owned to the top of the bank, just north of the beach and Long Island Sound. Lots 1 through 6 continued to be bounded to the south by the Chapman parcels. . . . Ruth Chapman Broderick was a successor in interest to that property. She died August 29, 1949. Broderick's estate was submitted for probate and Alfred L. Burdick was appointed the administrator. . . . Through an administrator's deed dated June 2, 1950, the Broderick estate conveyed the property to the Chapman Beach Association (hereinafter referred to as [the association]) for the sum of $12. . . . The [association] conveyed the property to the [district] by deed dated September 7, 2000. . . . This property is shown on a January 31, 2006 survey map as 'Property of the Chapman Beach Association, Inc.' . . . It is known as [l]ot 17, which is now approximately 0.94 acres in size.

"The [association] was incorporated in July, 1941. The stated purposes for the corporation are set forth in the articles of incorporation in part as follows:

"1. To provide means for the promotion of outdoor and indoor sports, entertainments, recreation and comfort of its members and their guests;

"2. To acquire, hold, purchase, occupy, lease, mortgage and encumber with easements, sell and convey land, buildings, rights, rights of way, or other interests thereon, including bathing beaches and any rights of

way or other easements therewith necessary or convenient to carry out the purposes of the [c]orporation. . . .

"Bylaws of the [association] were adopted on August 28, 1977. . . . The purposes of the [association] are set forth in [a]rticle II and are consistent with those set forth in the [a]rticles of [i]ncorporation. . . . Members of the [association] are specified to be '[a]ny person who shall own real estate at Chapman Beach.' . . . The bylaws provide for the assessment of dues, the election of officers, meetings of the corporation and appointment of committees. . . .

"On June 3, 2000, the town of Westbrook approved the establishment of the [d]istrict pursuant to General Statutes § 7-35. . . . The [d]istrict was formed to carry out the purposes of the [association] as previously stated and to collect much needed revenue to maintain common property. The [d]istrict held its organizational meeting on June 3, 2000. . . . On September 4, 2000, the [d]istrict completed its first annual report. . . . On September 7, 2000, the [association] conveyed its land holdings to the [d]istrict. . . . The [association] was dissolved in 2002. The [association] and the [d]istrict have paid the property taxes and insurance premiums on [l]ot 17.

"As a member of the [association] and the [d]istrict, the plaintiff has a right to use the disputed area. This right is shared with all other members. Members are also permitted to use other portions of lot 17. . . . There are no written rules prohibiting uses of the property. Rather, an unwritten 'good neighbor policy' or custom requires that members be attentive to their neighbors' needs and uses of the common property.

"In addition, as previously stated, the deeds to [l]ot 3 have always included an easement which states 'the right to pass and repass to and from the water fronting

said lot.' . . . Since 1947 to the present, the plaintiff and her predecessors in title have maintained [l]ot 3 and the abutting disputed area. This maintenance includes clipping the hedges, maintaining the lawn and planting bushes and flowers. The nature and extent of plantings have changed over the years, but the entire property has always been well maintained. The plaintiff's predecessors in title also built a concrete stairway leading from the disputed area down the slope to the beach. At the top of the stairway the plaintiff's father, Philip Paguni, installed a small brick landing. In 1992, [he] constructed a brick patio on the rear lawn of [l]ot 3, just north of the boundary line of the disputed area. . . .

"The plaintiff's father was by all accounts a respected resident of Chapman Beach. [Philip] Paguni occupied [l]ot 3 and used the disputed area for many years until his death in October 2002. [He] was the most active individual member of his family in matters pertaining to the maintenance and improvement of [l]ot 3 and the disputed area. [Association] residents reported encountering and interacting with him when they came upon the disputed area. [He] did not object to their presence and use of the property.

"In 1985, [association] properties were damaged by Hurricane Gloria, including damage to seawalls. The [association] lacked the [moneys] to make the repairs. In an effort to raise the funds, the members of the [association] considered selling portions of [l]ot 17 to the abutting property owners, which included the disputed area.

"The [association] had the land appraised in August, 1988. An appraisal of the disputed area was given to [Philip] Paguni for his consideration by the [p]resident of the [association]. . . . The appraised fair market value of the disputed area was $16,000. . . . At an

August 27, 1989 meeting of the [association], the membership voted not to sell the common property to the abutting property owners. . . . It has been a custom at Chapman Beach that abutting property owners maintain [l]ot 17, the properties fronting Long Island Sound. This has been done with the consent of the [association], the [d]istrict and the owners. This has been a mutually beneficial arrangement. The homeowners' yards are attractive and the common property is well maintained. This has had a positive effect on property values.

"At a July 17, 1994 meeting of the [association], a discussion was held concerning the use of the [a]ssociation property, specifically the properties abutting [l]ots 3 [through] 6 between First and Second Avenues. The [c]ommon [p]roperty [u]se [c]ommittee was appointed to report on recommendations. The committee consisted of the owners of these parcels and other members. Philip Paguni was a member of the committee. . . . The committee met on several occasions and prepared a report and recommendations. . . . [Philip] Paguni attended some of the committee meetings at which members discussed the bound stones which identified the boundary of the common property, which includes the disputed area.

"The committee's report indicates that '[a]t the first meeting, members agreed that our objective was to provide recommendations on use which ultimately would bring closure to the issue of "property use" which has fostered decisive dialogue and "we versus they" confrontations at [a]ssociation meetings and individual encounters.' . . . This is a reference to an ongoing disagreement among members about the placement of park benches on common property. The report, in relevant part, states that over the years the owners of the lots 'have maintained the contiguous [a]ssociation property as lawn and plantings so that there are no obvious

distinguishing property lines. Maintenance has been done at no cost to the [a]ssociation.' . . . Further, '[w]ith regard to contiguous property . . . there is a question of [a]ssociation liability since the property is used almost solely by the adjacent homeowners.' . . . The [c]ommittee recognized that '[t]he [a]ssociation pays the taxes on the land maintained by the adjacent property owners' and that '[t]he total common property of the [a]ssociation which provides access to Long Island Sound makes all property on Chapman Beach more valuable.' . . .

"The [c]ommon [p]roperty [u]se [c]ommittee made five alternate recommendations. First, '[m]aintain the "status quo" which has been established historically; that is "neighbors" maintain the land, the [a]ssociation pays the taxes. The common property is used for access to the beach and Long Island Sound now and in the future.' . . . Second, provide adjacent property owners with the option to enter a long-term lease for exclusive use. . . . Third, provide adjacent property owners with a long-term conservation easement. . . . Fourth, 'establish, in writing, [with each property owner a memorandum of understanding or easement specifically indicating the] uses which maintain "good neighbor relationships . . . ."' Fifth, sell the property giving adjacent property owners the first option to purchase. . . .

"The recommendations of the [c]ommon [p]roperty [u]se [c]ommittee were presented to a meeting of the [association] on September 1, 1996. The [a]ssociation adopted the [f]irst option, maintaining the status quo. . . . [Philip] Paguni participated in the committee recommendations and did not assert a claim of ownership to the disputed area adjacent to [l]ot 3. The practice of maintaining the status quo continues to the present day . . . . During the years of 1947 to the present, the plaintiff and her predecessors in title have used the property

as a summer home. The length of time that they spend on the property has fluctuated over the years. There were times when the house got a substantial amount of seasonal use and times when it did not. In the late 1950s, until 1964, and again in 2003 through 2005, the house was rented for weeks at a time. During these periods of time, the plaintiff and her predecessors would be absent from the property and would have no direct knowledge of other persons' use of the disputed area. During the time that Mary [M.] Annino owned the property there would be large family parties. The children of the owners in the chain of title grew up spending time at the beach and as they got older, the demands of education and work interfered with these activities.

"The use of the disputed area, as opposed to the time spent at it, has not changed. Depending [on] who was the owner of the property at the time, flowers and shrubs have been planted, trimmed and replanted in the disputed area. At times, the plaintiff and her family used the disputed area for leisure and recreation. This included the placement of a clothes line, chairs, a patio table and children's toys. During summer parties, it was not uncommon to park cars on the lawn including in the disputed area. Over the years, the family has occasionally placed their boat and a boat trailer in the disputed area.

"Residents of Chapman Beach never made complaints to the [association] or the [d]istrict about the use of the disputed area by the plaintiff and her predecessors. Likewise, the plaintiff and her predecessors have never informed the [association] or the [d]istrict that they object to the other residents' use of the disputed area.

"The uses which the plaintiff and her family have made of the disputed area are consistent with the uses

of [association] property located adjacent to lots 1 [through] 6 to the east and west of First Avenue by abutting property owners. . . . Historically, abutting property owners have been permitted to use [association] property as a part of their lawn.

"The land is also used for access to the beach and Long Island Sound. Residents of Chapman Beach use the common property for recreation and leisure activities. It is common knowledge among residents that they can use the property, including the disputed area. Residents walk and sit on the grass areas between First and Second Avenues. Children have played volleyball on the disputed area. It serves as a popular destination for the young people to gather. In times of stormy weather, residents have taken their boats off the beach and placed them in the disputed area. When residents organized a sailing regatta in the years of 1976 to 1984, they would congregate in the disputed area and participants would make a running start from it.

"Mary [M.] Annino would, on occasion, object to persons being present in the disputed area and would ask them to leave. Those instances generally involved children whom the plaintiff did not recognize as children of Chapman Beach residents and occurred once or twice a year. [Mary M.] Annino mistakenly believed that she owned not only the disputed area, but also the beach. At some point in time, she was advised that she did not own the beach. She instructed other family members to keep the gate at the pillars closed. Her actions were very embarrassing to the plaintiff and her brother. Prior to the commencement of this suit, the plaintiff had not attempted to exclude persons from the disputed area.

"[Mary M.] Annino's efforts to exclude persons [were] not successful. The residents have continued to utilize the disputed area and the remaining portion of [l]ot 17

in the manner previously described from 1947 to the present time."[1]

On the basis of these factual findings, the court, in its very thorough written decision, concluded that the plaintiff had failed to prove that her predecessors in title ever had adversely possessed the disputed area. Specifically, the court found that the plaintiff and her predecessors in title had permission to possess and use the disputed area, and that this permission never had been repudiated. The court further found that other members of the district also had permission to use the disputed area and the rest of lot 17, and that Mary M. Annino's efforts to exclude others from the disputed area were unsuccessful. Additionally, the court found that the plaintiff's predecessors in title had recognized the superior title of the district and the association. The court rendered judgment in favor of the district, and the plaintiff appealed to this court.

On appeal, the plaintiff claims that she "provided clear and positive proof that she and her predecessors adversely possessed the [d]isputed [a]rea." She argues that possession occurred "almost immediately after the Anninos obtained title in 1947" and that the "court's finding of initial permissive use . . . [was] clear error." Additionally, the plaintiff argues: "Despite the fact that the [plaintiff's predecessors in title] possessed the [d]isputed [a]rea and openly used it as their own property for nearly [sixty] years, without ever seeking or obtaining the permission of the [association] or the [d]istrict, the trial court held '[t]he possession of the disputed area by the plaintiff and her predecessors in title was permissive, and they had a clear right to use the property.' . . . Based on this [erroneous] finding,

---

[1] It also is undisputed that the district and its predecessor, the association, have paid since 1950 and continue to pay the property tax and insurance premiums on lot 17.

the court imposed the additional requirement that [the plaintiff] must show 'some clear, positive, and unequivocal act brought home to the owner' that [the plaintiff] is disavowing the [district's] title and asserting an adverse claim." (Citation omitted.) Although the plaintiff argues that neither she nor her familial predecessors in title ever sought or obtained permission to possess or use the disputed area, the court specifically found that they, like other residents, in fact, had been given permission to use the disputed area, which the plaintiff never repudiated.[2] We conclude that the court's finding is not clearly erroneous.

"[A]dverse possession usually is a mixed question of law and fact, depending on the circumstances and conduct of the parties as shown by the evidence. . . . Thus, [i]t is the province of the jury, or court sitting as a jury, to determine from conflicting or doubtful evidence the existence of facts necessary to constitute adverse possession . . . and that of the court to decide as a matter of law whether the facts found, or which are admitted or undisputed, fulfill the requirements of such possession. . . . If there is at least some evidence, although slight, which is sufficient to be submitted to the jury, and which tends to show the existence of the essential facts alleged to constitute adverse possession, and such evidence is disputed, or, if undisputed, is of a doubtful character, the question as to the existence of such facts is one of fact for the jury and should be submitted to [it] for determination, under proper instructions from the court; or in case of a trial by the court alone, the question is one of fact for the court sitting as a jury. . . .

[2] Also, on appeal the plaintiff does not challenge the court's finding that the association and the district have paid the property taxes and insurance premiums on lot 17 since 1950. See, e.g., *O'Connor* v. *Larocque*, 302 Conn. 562, 584–85, 31 A.3d 1 (2011).

"Whether the facts as found by the jury constitute adverse possession is a question of law for the court. The fact of adverse possession also is a question of law for the court and should not be submitted to the jury where the facts with regard thereto are admitted, or the evidence thereof is undisputed and susceptible of but one reasonable inference or conclusion, or where the evidence is insufficient to go to the jury on such question as where there is no evidence in the record upon which the jury could base a finding of adverse possession. . . . Consistent with this principle, this court repeatedly has recognized that [i]t is the province of the trial court to find the facts upon which [such a] claim is based. Whether those facts make out a case of adverse possession is a question of law reviewable by [the] court. . . . The same principle has been applied in the context of other property takings. . . .

"Because a trial court is afforded broad discretion in making its factual findings, those findings will not be disturbed by a reviewing court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . . In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court. . . .

"With respect to the standard of proof, [a]dverse possession is not to be made out by inference . . . but by clear and positive proof. . . . [C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. . . . Application of the pertinent legal standard to the trial court's factual findings is subject to our plenary review. . . . The burden of proof is on the party claiming adverse possession. . . . Despite extensive case law on the subject, the root of adverse possession in our law is statutory. General Statutes § 52-575 (a) establishes a fifteen year statute of repose on an action to oust an adverse possessor." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *O'Connor* v. *Larocque*, 302 Conn. 562, 572–79, 31 A.3d 1 (2011). "[T]o establish title by adverse possession, the claimant must oust an owner of possession and keep such owner out without interruption for fifteen years by an open, visible and exclusive possession under a claim of right with the intent to use the property as his own and without the consent of the owner." (Internal quotation marks omitted.) Id., 581.

In this case, prior to August, 1906, lot 3 was owned by Charles Chapman. Chapman also owned lot 17, which contains the disputed area, just south of lot 3. Lot 17 abuts the beach and Long Island Sound. In August, 1906, Chapman conveyed lot 3 to Mary Lohmes "together with the right to pass and repass to and from the water fronting said lot" (easement). The easement over the

disputed area has remained in the deed to lot 3 since Chapman conveyed the property in 1906.

In July, 1941, the association was incorporated, in part, for the following purposes: "1. To provide means for the promotion of outdoor and indoor sports, entertainments, recreation and comfort of its members and their guests; [and] 2. To acquire, hold, purchase, occupy, lease, mortgage and encumber with easements, sell and convey land, buildings, rights, rights of way, or other interests thereon, including bathing beaches and any rights of way or other easements therewith necessary or convenient to carry out the purposes of the Corporation."

On April 2, 1947, John L. Annino and Mary M. Annino (Anninos) acquired lot 3, and, according to the plaintiff, almost immediately began their fifteen years of uninterrupted open, visible and exclusive possession of the disputed area, acting under a claim of right with the intent to use the property as their own, without the consent of the actual owner or owners. Ruth Chapman Broderick, the daughter of Charles Chapman and a successor in interest to lot 17, died on August 29, 1949, and, through an administrator's deed, lot 17 became the property of the association on June 2, 1950, three years after the Anninos obtained title to lot 3. Following the death of her husband in 1954, Mary M. Annino continued to own lot 3 until September 9, 1981. According to the plaintiff, it was during the years that the Anninos, or, in particular, Mary M. Annino, owned lot 3 that the adverse possession of the disputed area allegedly was established.

The plaintiff argues that although she and her predecessors in title have adversely possessed the disputed area for nearly sixty years, the court improperly focused on the later years rather than on the relevant years when the adverse possession began and the fifteen years of

exclusive and hostile possession was established from 1947 to 1962. She also argues that the court improperly found that the initial possession of the disputed area was permissive and that the court thereafter used a heightened standard on the basis of this unsupported finding.

Both lot 3 and lot 17 were owned by Charles Chapman in the early 1900s. Charles Chapman then conveyed lot 3 to Mary Lohmes in mid-1906, along with an easement over lot 17, including over the disputed area. There were hedges and stone pillars on the disputed area during the time Mary Lohmes held title to lot 3. There also was a gate present on the disputed area, and there was some testimony that the Anninos had had the gate installed, but the court did not credit such testimony and concluded that it was unable to determine when or by whom the gate was installed.[3] The title to lot 3 changed hands several times before it was conveyed to the Anninos in 1947, with the easement still intact. The plaintiff does not allege on appeal that any record owner of lot 3 had attempted to adversely possess the disputed area prior to the Anninos' ownership of lot 3; her argument is that the fifteen years began when her grandparents, the Anninos, took title to lot 3. The prior owners of lot 3, however, each had an easement over the disputed area, and the plaintiff makes no allegation that their use of the disputed area was anything but permissive.[4] Additionally, even if the Anninos attempted

[3] The plaintiff's uncle, John L. Annino, Jr., initially testified that his uncle built and installed the gate, but he later admitted that he had no personal knowledge of that, and that he was "assuming" that his uncle had built and installed the gate. He maintained, however, that the gate was not present when his parents, the Anninos, purchased lot 3 in 1947, when he was fifteen or sixteen years old. At his earlier deposition, however, he had stated that he had no recollection of whether the gate had been present when his parents purchased lot 3.

[4] We note that the plaintiff had alleged in her complaint that the "dates of possession and use of the area claimed by adverse possession are August 18, 1906, to present." Before the trial court, however, she instead argued

to adversely possess the disputed area from the moment they acquired title to lot 3 in 1947, the association obtained title to lot 17 in 1950, which included the disputed area, and advanced an unwritten "good neighbor policy" that permitted all association members, including the Anninos, to use the common property, including lot 17. Accordingly, even if the Anninos had not requested permission to use the disputed area in 1947, they already had permission by virtue of the deeded easement and later by virtue of the unwritten good neighbor policy of the association, which took title to lot 17 in 1950.

The plaintiff also argues, however, that even if the Anninos had permission to use the disputed area, their use went far beyond that which was permitted and amounted to actual possession. She contends that this possession served to repudiate any permission that the Anninos may have been granted initially. We disagree. The court specifically found that Mary M. Annino was unsuccessful in her attempts to keep other residents from using the disputed area and that the other residents have continued to use the disputed area to the present time. The court's finding specifically negates the plaintiff's claim of exclusive possession because it shows that her predecessors in title lacked the necessary dominion and control over the disputed area no matter how extensive was their actual use of that area. See *Bowen* v. *Serksnas*, 121 Conn. App. 503, 508–509, 997 A.2d 573 (2010) ("In general, exclusive possession can be established by acts, which at the time, considering the state of the land, comport with ownership; viz., such acts as would ordinarily be exercised by an owner in appropriating land to his own use and the exclusion of others. . . . Thus, the claimant's possession need not be absolutely exclusive; it need only be a type of

that the fifteen year period for adverse possession began in 1947 when her grandparents took title to lot 3.

possession which would characterize an owner's use. . . . It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question. . . . The use is not exclusive if the adverse user merely shares dominion over the property with other users." [Internal quotation marks omitted.]); see also *Arcari* v. *Dellaripa*, 164 Conn. 532, 536, 325 A.2d 280 (1973) ("[t]he requisite of exclusive possession for the statutory period is not met if the adverse user merely shares dominion over the property with other users"); *Short Beach Cottage Owners Improvement Assn.* v. *Stratford*, 154 Conn. 194, 199, 224 A.2d 532 (1966) ("One of the requisites to acquiring property by adverse possession is that the claimant maintain an exclusive possession of the disputed area during the running of the fifteen-year period. . . . This condition is not met if the adverse user merely shares dominion over the property with other users. . . . Since . . . the [plaintiffs' predecessors in title] never maintained an exclusive possession over the beach area, in that others occupied cottages on the property without the [predecessors'] permission, the conclusion that the plaintiffs failed to establish title by adverse possession was required." [Citations omitted.]); *Lisiewski* v. *Seidel*, 95 Conn. App. 696, 702, 899 A.2d 59 (2006) ("[i]f dominion is shared, then the exclusivity element of adverse possession is absent").

The following findings of fact made by the court are relevant to the element of exclusivity. From 1947 to the present, the plaintiff and her predecessors in title have had a summer cottage on lot 3; the exact amount of time they spent there varied over the years. At times, they spent a substantial amount of the summer there and, at other times, they spent only a short amount of time there. From the late 1950s until 1964, the cottage

was rented for weeks at a time.[5] During these periods of time, which is part of the time that the plaintiff contends ripened her adverse possession claim, the plaintiff and her predecessors in title were absent from the property and had no direct knowledge of other persons' use of the disputed area. Other residents of Chapman Beach have used and continue to use the common property of the district for recreation and leisure activities, including the disputed area. The residents know that they can use lot 17, including the disputed area. The residents walk on the disputed area, sit on the grass, play volleyball, gather there and, during stormy weather, they have taken their boats off the beach and placed them in the disputed area.[6] Although

[5] The plaintiff testified that for four or five years during the 1950s and 1960s, the Anninos rented out the cottage for three to four consecutive weeks and that she did not know how the renters or the association residents used the property during that time. The plaintiff's uncle, John L. Annino, Jr., also testified that for approximately four years in the 1950s, the cottage was rented out for the entire month of August.

[6] For example, Patricia Ann Pandolfe testified that she has been going to Chapman Beach since she was a toddler and that her father built a summer home there in 1950, when she was approximately seven years old. In 1967, they added heat to the home, and Pandolfe began to spend more time there. Since the 1980s, she primarily has lived there year round. Pandolfe testified that she walked across the disputed area, either alone or with others, from approximately 1957 to 2007. She also testified that all of the residents knew that they had a right to use the disputed area.

Paul K. Bransfield testified that he was a summer resident of Chapman Beach from 1967 to 1990, and that he still goes there, but less frequently. Bransfield stated that he used the disputed area as a passway, for sailboat races, to store boats on the grass, for sunbathing and for playing games. His brother, Peter Bransfield, testified that his parents own a home at Chapman Beach and that he has been going there since his birth in 1949. Peter Bransfield further testified that he and others used the disputed area as a passway and for social purposes.

Jacqueline W. Coppes testified that she was born in 1934, spent her entire childhood at Chapman Beach, and purchased her own cottage there in 1969. Coppes stated that she personally knew Richard Chapman and frequently walked with him across the disputed area prior to 1947, and that she used the area for sledding in the winter. She further stated that she and others played there "all the time" during the summer and that they used the area as a passway between First and Second Avenues. Coppes also testified that

Mary M. Annino occasionally attempted to exclude people from the disputed area, she was not successful, and the residents continued to use the disputed area. We conclude that these findings, which have support in the record and are not clearly erroneous, lead to one conclusion, namely, that the plaintiff failed to prove, by clear and convincing evidence, that her predecessors in title had exclusive dominion and control over the disputed area for any continuous fifteen year period. Having so concluded, we need not examine the additional elements of her adverse possession claim or her additional claims of error.

The judgment is affirmed.

In this opinion the other judges concurred.

they continued to use the area in this manner after it was acquired by the association in 1950, and that, even after starting her own family in 1958, she continued to pass through the disputed area and use it in the winter for sledding with her children.