## STATE OF CONNECTICUT *v.* CAROL HOLDEN

Superior Court, Judicial District of Windham
File No. W11D-CR13-0151132-S

Memorandum filed December 2, 2014

*George Flores*, for the defendant.

*Matthew A. Crockett*, senior assistant state's attorney, for the state.

SEELEY, J.

## I

## PROCEDURAL BACKGROUND

On July 12, 2013, in the early morning hours, numerous fire departments responded to a residential address due to smoke coming from the eaves of the house. The fire personnel entered the home, suppressed the fire and found the defendant, Carol Holden, in a bedroom. The defendant was transported to the hospital. According to the probable cause affidavit, the defendant admitted that she lit the fire because she was sick of society and people, and she wanted to get back at her landlord for charging high rent and threatening to have

her evicted. She said she put corn oil on the electric stove, turned on the stove and went to bed.

The defendant was arrested and charged with arson in the second degree, breach of the peace in the second degree and criminal damage of a landlord's property in the first degree. On August 2, 2013, the court (*Riley, J.*) ordered that the defendant be evaluated for competency pursuant to General Statutes § 54-56d. Following a hearing held on August 30, 2013, the court (*Swords, J.*) found the defendant was not competent to stand trial, but that there was a substantial probability that she could be restored to competence through an inpatient psychiatric hospitalization at the Whiting Forensic Division of Connecticut Valley Hospital (CVH) for a period of sixty days.

A second hearing to determine the defendant's competency was held on October 25, 2013. The court (*Riley, J.*) found that the defendant had not yet been restored to competence to stand trial, but that there was a substantial probability that she could be restored to competence within the time allowed by law. The court ordered a further period of ninety days of inpatient treatment at CVH.

Another hearing was held on March 7, 2014, to address the treatment team's determination that the defendant would not attain competency within the remainder of the period covered by the placement order unless she was administered psychiatric medication for which she was unwilling or unable to provide consent. The court (*Riley, J.*) ordered the appointment of Susan Devine, A.P.R.N., B.C., to serve as a health care guardian pursuant to § 54-56d (k) (3).

On October 10, 2014, this court (*Seeley, J.*) held a hearing on the state's request that the defendant be forcibly medicated in an attempt to restore her to competency to stand trial. At the hearing, the court heard

testimony from Mark S. Cotterell, M.D., a psychiatrist in the Restoration Services Unit at the Whiting Forensic Division of CVH, and from Ms. Devine, the court-appointed health care guardian.

Dr. Cotterell testified that the defendant suffers from paranoid schizophrenia and recommended that she take two medications, Haloperidol (also known as Haldol) and Olanzapine (also known as Zyprexa). Both medications are used to treat symptoms of psychosis and mood disorders.

These medications have notable potential side effects. The use of Haloperidol can result in dizziness, headaches, the development of persistent motor problems expressed by tics and tremors, an increase or decrease in blood pressure, constipation, sleepiness, cognitive impairment such as the slowing of thought processes and a sense of restlessness such that the person cannot sit still. Similarly, notable potential side effects as a result of using Olanzapine include dizziness, dry mouth, lowering of blood pressure, increased heart rate, weight gain, increased blood sugar levels, joint pain, constipation and an increased rate of sedation. Dr. Cotterell agreed that the use of these antipsychotic medications can be sedating, which would make it harder for someone to assist in their own defense. Likewise, this medication also can result in someone feeling jittery and restless, which could then impact their ability to concentrate and participate in their defense.

The defendant currently is supposed to take 7.5 mg of Haldol; however, her willingness to take this antipsychotic medication has been inconsistent. The use of 7.5 mg of Haldol has not yet restored her to competence to stand trial. Therefore, Dr. Cotterell is proposing that the defendant be administered 2-30 mg of Haldol and/or 5-30 mg of Olanzapine daily by mouth. If the oral medication is refused, then it would be administered by

injection in accordance with the Proposed Medication Regimen outlined in a Memorandum dated October 10, 2014. See Hearing Exhibit 1.

Dr. Cotterell initially testified that it is his opinion to a reasonable degree of medical certainty that "the use of medication either voluntary or involuntary would very likely lead to a restoration of competence." He also stated that medical records from an inpatient hospitalization in 2008 showed that when the defendant has been administered antipsychotic medication, her psychotic symptoms lessened at that time. Dr. Cotterell acknowledged that the medical records from 2008 do not indicate that as a result of the use of the antipsychotic medication at that time, the defendant was then determined to be legally competent; rather, the records only described her as less psychotic. Dr. Cotterell concluded that "using those medications at this time will likely result in her being . . . restore[d] to competency." He also opined that forced medication "is a good strategy to have and it is worth a try." Finally, Dr. Cotterell agreed that he is unable to say with "any certainty" that if the defendant is given an increased dose of either Haldol and/or Olanzapine, she will be restored to competence.

Susan Devine, the court-appointed health care guardian, testified that based on her review of the records, numerous meetings with the defendant, and discussions with the treatment providers at CVH, it is in the defendant's actual best interest to receive psychiatric medications, involuntarily if necessary. Ms. Devine's recommendation is detailed in a thorough report dated October 6, 2014. See Hearing Exhibit 2. Ms. Devine testified that she considered the risks and benefits, the adverse side effects on the defendant and the prognosis for the defendant in reaching her opinion.

In her report, Ms. Devine noted the reported side effects for psychiatric medications, but concluded that

"the defendant is in an acute hospital setting where she is monitored continuously by trained staff."[1] See Hearing Exhibit 2, p. 8. Ms. Devine detailed the efforts made by the treatment team at CVH to restore the defendant to competency by less intrusive means (other than medication) such as intensive psychoeducation, individual psychotherapy, groups to address competency education, stress management, community re-entry and recovery group.[2] Id., pp. 7–8. Ms. Devine also indicated "[t]he defendant's symptoms will likely respond to a therapeutic dose of antipsychotic medication." Id., p. 8.

## II

## DISCUSSION

The United States Supreme Court has recognized that forcible injection of medication into the body of a non-consenting person "represents a substantial interference with that person's liberty." *Washington* v. *Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990). The Supreme Court further recognized in *Sell* v. *United States*, 539 U.S. 166, 169, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), that the constitution allows the government to forcibly medicate a mentally ill criminal defendant who is not a danger to himself or others in order to render that defendant competent to stand trial for serious offenses in limited circumstances. "[I]t has been observed that when the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense." *State* v. *Seekins*, 299 Conn. 141, 154, 8 A.3d 491 (2010), citing *Washington* v. *Harper*,

---

[1] Dr. Cotterell also indicated that the staff at CVH would monitor all the possible side effects, including those side effects that may impact the defendant's ability to assist in her own defense.

[2] Dr. Cotterell also testified that the CVH treatment team tried less intrusive means to restore the defendant to competency, but those efforts failed.

supra, 237–38 (Stevens, J., concurring in part and dissenting in part). The *Sell* court indicated the circumstances in which it would be appropriate to administer forced medication to render a defendant competent would be rare. *Sell* v. *United States*, supra, 180; see also *State* v. *Seekins*, supra, 155; *United States* v. *Chatmon*, 718 F.3d 369, 374 (4th Cir. 2013) ("we have never departed from the recognition that such orders [involuntary medication orders] are a tool that must not be casually deployed, for forced medication is a serious intrusion upon the integrity of the individual and the effects of such medication upon body and mind are often difficult to foresee").

Thus, to override the defendant's liberty interest in avoiding the unwanted administration of antipsychotic drugs for the purpose of a restoring the defendant to competency to stand trial, under *Sell*, due process requires this court to determine four factors:

(1) Important government interests are at stake, which can be established when a defendant is accused of a serious crime and special circumstances do not undermine the government's interest in trying him for that crime;

(2) Involuntary medication will significantly further those concomitant state interests, i.e., involuntary medication is both (a) substantially likely to render the defendant competent to stand trial, and (b) substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense;

(3) Involuntary medication is necessary to further those interests, specifically, the court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results; and

(4) Administration of the drugs is medically appropriate in that it would be in the defendant's best medical

interest in light of his medical condition. *Sell* v. *United States*, supra, 539 U.S. 180–81; see also *State* v. *Jacobs*, 265 Conn. 396, 399–400, 828 A.2d 587 (2003) (concluding that the standard articulated in *Sell* governs issue of involuntarily medicating defendant so defendant may be restored to competency to stand trial); *State* v. *Seekins*, supra, 299 Conn. 155–56 (same); *State* v. *Davis*, 122 Conn. App. 664, 998 A.2d 1250 (2010) (application of *Sell* factors).

Connecticut's statutory scheme permits a court to order that a defendant be involuntarily medicated if it finds by clear and convincing evidence that:

(1) To a reasonable degree of medical certainty, involuntary medication of the defendant will render the defendant competent to stand trial;[3]

(2) An adjudication of guilt or innocence cannot be had using less intrusive means;[4]

(3) The proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests;[5]

(4) The proposed drug regimen will not cause an unnecessary risk to the defendant's health;[6] and

(5) The seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination.[7] See General Statutes § 54-56d (k) (2).

---

[3] This statutory factor, § 54-56d (k) (2) (A), corresponds to the first part of the second *Sell* factor.

[4] This statutory factor, § 54-56d (k) (2) (B), corresponds to the third *Sell* factor.

[5] This statutory factor, § 54-56d (k) (2) (C), corresponds to the second part of the second *Sell* factor.

[6] This statutory factor, § 54-56d (k) (2) (D), corresponds to the fourth *Sell* factor.

[7] This statutory factor, § 54-56d (k) (2) (E), corresponds to the first *Sell* factor.

A

Standard of Proof: Clear and Convincing Evidence

Section 54-56d (k) (2) requires that the state prove the statutory factors by the standard of clear and convincing evidence. Similarly, while the *Sell* court did not prescribe the standard the government must meet in establishing the four factors for a due process analysis, most courts in other jurisdictions have required the government to prove the *Sell* factors by clear and convincing evidence. See, e.g., *United States* v. *Gomes*, 387 F.3d 157, 160 (2d Cir. 2004), cert. denied, 543 U.S. 1128, 125 S. Ct. 1094, 160 L. Ed. 2d 1081 (2005).[8] "[T]he standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of the

[8] See also *United States* v. *Debenedetto*, 757 F.3d 547, 552 (7th Cir. 2014) (government must establish the *Sell* factors by clear and convincing evidence); *United States* v. *Dillon*, 738 F.3d 284, 292 (D.C. Cir. 2013) ("[h]olding the Government to a clear and convincing standard of proof affords due regard to the nature of the liberty interest at stake in forced-medication cases"); *United States* v. *Diaz*, 630 F.3d 1314, 1332 (11th Cir.), cert. denied,        U.S.       , 132 S. Ct. 128, 181 L. Ed. 2d 49 (2011); *United States* v. *Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010) (proper standard is clear and convincing evidence because of the importance of the liberty interests implicated by a *Sell* order and the high risk of error); *United States* v. *Bush*, 585 F.3d 806, 814 (4th Cir. 2009) ("A higher standard . . . minimizes the risk of erroneous decisions in this important context. . . . [We] conclude that the government must satisfy the *Sell* factors by clear and convincing evidence." [Citation omitted.]); *United States* v. *Grape*, 549 F.3d 591, 598 (3d Cir. 2008) (the government bears the burden of proof by clear and convincing evidence); *United States* v. *Payne*, 539 F.3d 505, 508–509 (6th Cir. 2008) ("the risk of error and possible harm involved in deciding whether to forcibly medicate for the purpose of restoring competency are so substantial as to require the government to prove its case by clear and convincing evidence" [internal quotation marks omitted]); *United States* v. *Fazio*, 599 F.3d 835, 840 n.2 (8th Cir. 2010), cert. denied, 562 U.S. 1141, 131 S. Ct. 901, 178 L. Ed. 2d 759 (2011); *United States* v. *Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005) ("the . . . *Sell* factors [that] depend upon factual findings . . . ought to be proved by the government by clear and convincing evidence . . . [because of] the vital constitutional liberty interest at stake" [citation omitted]).

factual conclusions for a particular type of adjudication." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 793, 700 A.2d 1108 (1997), quoting *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). "Thus, the more confidence our society requires in the correctness of factual determinations for a particular type of litigation, the higher the standard of proof the law applies to that litigation." *Miller* v. *Commissioner of Correction*, supra, 793.

As noted by the Connecticut Supreme Court in *Miller*, "[t]he clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It 'is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are *highly probably* true, that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist.' "[9] (Emphasis in original.) Id., 794, quoting *State* v. *Bonello*, 210 Conn. 51, 66, 554 A.2d 277, cert. denied, 490 U.S. 1082, 109 S. Ct. 2103, 104 L. Ed. 2d 664 (1989); see also *Aramony* v. *District of Chapman Beach*, 144 Conn. App. 514, 530, 72 A.3d 1252 (2013). The *Miller* court further noted: "Although

[9] The Court of Appeals for the Second Circuit relied on the following definition found in Black's Law Dictionary for clear and convincing evidence as "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain . . . ." (Citation omitted; internal quotation marks omitted.) *Ragbir* v. *Holder*, 389 Fed. Appx. 80, 84–85 (2d Cir. 2010), cert. denied, U.S. , 132 S. Ct. 95, 181 L. Ed. 2d 24 (2011); see also *Dongguk University* v. *Yale University*, 873 F. Supp. 2d 460, 466 (D. Conn. 2012) (same), aff'd, 734 F.3d 113 (2d Cir. 2013). Other courts have defined clear and convincing evidence as evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." (Internal quotation marks omitted.) *Blair* v. *Inside Edition Productions*, 7 F. Supp. 3d 348, 358 (S.D.N.Y. 2014).

we have characterized this standard of proof as a 'middle tier standard' . . . and as 'an intermediate standard' . . . between the ordinary civil standard of a preponderance of the evidence, or more probably than not, and the criminal standard of proof beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the *high probability* and the *substantial greatness of the probability* of the truth of the facts asserted indicates that it is a very demanding standard . . . . We have stated that the clear and convincing evidence standard 'should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory.' " (Citations omitted; emphasis in original.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 794–95, quoting *Lopinto* v. *Haines*, 185 Conn. 527, 539, 441 A.2d 151 (1981).

B

Factors Pursuant to *Sell* and General Statutes
§ 54-56d (k) (2)

1

Important Governmental Interests

The first prong of the *Sell* test requires that the state prove by clear and convincing evidence that it has an "important governmental interest" in prosecuting the defendant. This factor corresponds to subparagraph (E) of § 54-56d (k) (2), namely, "the seriousness of the alleged crime is such that the criminal law enforcement interest of the state in fairly and accurately determining the defendant's guilt or innocence overrides the defendant's interest in self-determination."

The United States Supreme Court observed in *Sell*, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important. That is

so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security." *Sell* v. *United States*, supra, 539 U.S. 180. In *State* v. *Davis*, supra, 122 Conn. App. 672, the Connecticut Appellate Court noted with approval that an objective factor for determining whether a particular offense is "serious" is to look at the maximum statutory penalty. The *Davis* court stated, "[b]y utilizing the potential statutory penalty to assess the seriousness of a crime, we employ an objective standard for application and thereby avoid any arbitrary determinations, and further, respect the judgment of the legislative branch as reflective of societal attitudes." (Internal quotation marks omitted.) Id., quoting *United States* v. *Green*, 532 F.3d 538, 549 (6th Cir. 2008), cert. denied, 556 U.S. 1270, 129 S. Ct. 2735, 174 L. Ed. 2d 250 (2009); see also *State* v. *Tucker*, 219 Conn. 752, 759, 595 A.2d 832 (1991) ("the prime index of the gravity of a particular crime is the length of the statutorily authorized prison term that a defendant convicted of the crime may be required to serve").[10]

---

[10] The Connecticut Supreme Court observed that all of the federal circuit courts that have reviewed the propriety of an order of involuntary medication based on the *Sell* factors have looked at the potential penalty that may be imposed in determining whether a crime is serious. *State* v. *Seekins*, supra, 299 Conn. 156–57. However, some courts of appeal look to the maximum statutory penalty, while others calculate the defendant's probable sentencing range under the federal sentencing guidelines. See id., 157–59 (discussion of the two different approaches used by federal courts and cases cited therein). Since Connecticut does not have sentencing guidelines, "the sentencing guideline approach to assessing the seriousness of a crime is not an option available to the courts of this state." Id., 159. Nevertheless, the *Seekins* court recognized that an accused might be able to present credible evidence of the likely penalty that he or she faces if convicted as charged and a trial court then would be required to consider that evidence in assessing the state's interest in bringing the defendant to trial. Id., 160 n.13. In *Seekins*, the court did not consider this issue since the defendant offered no evidence with respect to the sentence he likely would receive if convicted of the charged offenses. This court also will not consider the likely penalty that

Based on the record presented to this court, there can be no dispute that the defendant is charged with a serious crime. As noted by the Connecticut Supreme Court, " 'the primary rationale [of the arson statutes] is the protection of human life or safety.' " *State* v. *Parmalee*, 197 Conn. 158, 163 n.5, 496 A.2d 186 (1985), quoting Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stats. Ann. (West 1972) p. 36. Further, the statutory scheme and legislative history of the arson statutes, General Statutes §§ 53a-111 through 53a-114, "demonstrate that the legislature sought to proscribe not only arson that places others in actual danger but also arson that gives rise to potential danger." *State* v. *Parmalee*, supra, 163. General Statutes § 53a-112, arson in the second degree, was specifically directed to situations where a person intentionally burns another's building, and "the size of the conflagration and the actual harm involved have no bearing on the arsonist's culpability under the section. The very act of setting the fire and placing others at substantial risk triggers liability under § 53a-112." Id., 164. Therefore, even though a lesser degree of risk is involved in the arson in the second degree statute (as compared to arson in the first degree which focuses on arson that places people in actual danger), the basic rationale behind § 53a-112 is "protection of human life and safety"; (internal quotation marks omitted); id., 163; and, as such, the defendant is charged with a serious crime.

Furthermore, arson in the second degree is a class B felony with a maximum penalty of twenty years imprisonment. See General Statutes §§ 53a-112 and 53a-35a (6). In fact, during argument defense counsel recognized the seriousness of the crime when he stated, "any

the defendant faces if convicted since no evidence was presented on this issue; instead, this court will focus on the statutory maximum possible sentence to determine seriousness.

arson is a serious case." Accordingly, the state has proven by clear and convincing evidence that the defendant's crime is serious and provides the state an important interest in bringing her to trial. See, e.g., *United States* v. *Evans*, 404 F.3d 227, 238 (4th Cir. 2005) ("it [is] beyond dispute that the Government . . . [has] an important interest in trying a defendant charged with a felony carrying a *maximum* punishment of [ten] years imprisonment" [emphasis added]).

Notwithstanding this court's finding that the state has an important interest since the crime charged is serious, *Sell*'s first prong requires more. The inquiry next focuses on "the facts of the individual case" and whether any special circumstances, despite the seriousness of the crime, reduce the state's interests to less than "important." See *Sell* v. *United States*, supra, 539 U.S. 180 (special circumstances may lessen the importance of the government's interest in prosecution). For example, the *Sell* court noted that a defendant who refuses medication may be subject to a lengthy period of civil commitment, which may then lessen the need for prosecution. Id. Similarly, another "special circumstance" that could result in a reduced interest in prosecuting a defendant would be if that defendant "has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . .)." (Citation omitted.) Id.

In this case, there are no special circumstances that would outweigh the state's interest in prosecuting this serious case. First, while it was pointed out that civil commitment is a possibility in this case, that possibility is too speculative to counter the state's interest in prosecution. Civil commitment is not a substitute for imprisonment. See, e.g., *State* v. *Davis*, supra, 122 Conn. App. 673.

As noted by Dr. Cotterell, if the defendant is not restored to competency during the statutory period,

then the court either may release her from custody or order the defendant to be placed in the custody of the Commissioner of Mental Health and Addiction Services and order the commissioner to apply for civil commitment through the Probate Court. See also General Statutes § 54-56d (m). The Probate Court must order civil commitment to a hospital for psychiatric disabilities if it finds by clear and convincing evidence that the defendant has psychiatric disabilities and is dangerous to herself or others. See General Statutes § 17a-498 (c). However, no evidence was presented to suggest that the defendant is a danger to herself or others,[11] and thus, the possibility of civil commitment is very slight, if it exists at all. See, e.g., *United States* v. *Gillenwater*, 749 F.3d 1094, 1101 (9th Cir.) (no evidence in the record to suggest that the defendant is eligible for civil commitment; mere possibility not sufficient to lessen the government's interest in prosecution), cert. denied,     U.S.
    , 135 S. Ct. 222, 190 L. Ed. 2d 169 (2014); *United States* v. *Mikulich*, 732 F.3d 692, 699 (6th Cir. 2013) (while it does not need to be shown with absolute certainty that defendant will be civilly committed, " 'government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain,' " and cases cited therein).

The tenuous nature of civil commitment in this case is supported by the fact that on January 22, 2014, CVH petitioned the Probate Court for a special limited conservator to make treatment decisions for the defendant on the basis that she was unable to do so,[12] and that

---

[11] In the report prepared by Ms. Devine, the defendant's health care guardian, she noted that the defendant "has had three physical altercations with staff and other patients driven by thoughts such as 'her son's spirit' was in them." Hearing Exhibit 2, p. 8. Nevertheless, this court does not find that this one reference—without more—provides sufficient information that the defendant poses a danger to others. There is no evidence that the defendant was arrested as a result of these "physical altercations," which leads the court to conclude they were not serious or violent.

[12] See General Statutes § 17a-543a.

request was denied by the probate judge. See Hearing Exhibit 2 (Letter of Health Care Guardian), p. 5. As the Supreme Court stated in *Sell*, "[w]e do not mean to suggest that civil commitment is a substitute for a criminal trial. . . . The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Sell* v. *United States*, supra, 539 U.S. 180. Here, the speculative possibility of civil confinement does not undermine the state's strong interest in prosecuting the defendant for the serious crime charged against her.

Secondly, while the defendant has been incarcerated as a pretrial detainee since July 12, 2013, that time period of approximately sixteen months does not significantly undermine the state's interest in having a trial. The defendant is facing a maximum sentence of twenty years, and therefore, having been incarcerated for just sixteen months does not defeat the seriousness of the offense charged.

Finally, the defendant argued at the hearing that the facts of this particular case, namely, that the defendant is fifty-seven years old with no prior criminal history and that the fire was put out quickly without anyone getting hurt, diminish the state's interest in prosecuting her. This court disagrees. While the defendant's age and no prior criminal history may serve as mitigation in terms of the ultimate sentence she would receive upon conviction, those factors do not lessen the seriousness of the offense. Furthermore, the fact that the fire was put out quickly without anyone receiving injuries does not lessen the seriousness of the charge since the crime of arson in the second degree addresses the setting of intentional fires that gives rise to *potential* danger. As noted previously, "the size of the conflagration and the actual harm involved [has] no bearing on the arsonist's culpability under this section. The very act of setting the fire and placing others at substantial risk triggers

liability under § 53a-112." See *State* v. *Parmalee*, supra, 197 Conn. 164.

In sum, in considering the seriousness of the crime of arson in the second degree, the likelihood of civil commitment, the present length of the defendant's pretrial confinement, and the individual facts of this case, the court finds there are no mitigating or special circumstances that exist to reduce the state's important interest in prosecuting the defendant.

2

Furthering Governmental Interests

*Sell*'s second prong requires the court to determine whether "involuntary medication will significantly further the state's interest in prosecuting the defendant." This prong has two parts that the state must prove by clear and convincing evidence:

First, the state must prove that the administration of the drugs is *substantially likely* to render the defendant competent to stand trial. The wording of Connecticut's statute under § 54-56d (k) (2) (A) is different, and requires the state to prove by clear and convincing evidence that "[t]o a *reasonable* degree of medical *certainty*, involuntary medication of the defendant will render the defendant competent to stand trial . . . ." (Emphasis added.) The court finds under either standard, *Sell*'s "substantially likely" standard or the statute's "[t]o a reasonable degree of medical certainty" standard, the state has not sustained its burden of proving either by clear and convincing evidence.

Dr. Cotterell's testimony was inconsistent and ambiguous. At first, Dr. Cotterell testified that it is his opinion to a reasonable degree of medical certainty that "the use of medication either voluntary or involuntary would very likely lead to a restoration of competence." Dr.

Cotterell subsequently stated that "using those medications at this time *will likely* result in her being . . . restore[d] to competency." (Emphasis added.) He also opined that forced medication "is a good strategy to have and it is worth a try." Dr. Cotterell ultimately agreed that he is unable to say with "any certainty" that if the defendant is given an increase dose of either Haldol and/or Olanzapine, that she will be restored to competence.

It bears repeating that the clear and convincing standard is a very demanding standard and that the Connecticut Supreme Court has stated that this standard "should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 795. Dr. Cotterell's initial opinion (to a reasonable degree of medical certainty that the use of medication would *very likely* lead to a restoration of competence) was fatally undermined by his subsequent testimony that administering those medications "*will likely*" result in the defendant being restored to competence and that it "is a good strategy to have and *it is worth a try*." (Emphasis added.)

Dr. Cotterell's opinion was based on the fact that medical records from an inpatient hospitalization in 2008 showed that when the defendant was administered antipsychotic medication, her psychotic symptoms "lessened" at that time. Notably, Dr. Cotterell did not provide any additional information about the "lessening" of the defendant's psychotic symptoms, only that she was less psychotic. Dr. Cotterell acknowledged that the medical records from 2008 did not indicate that as a result of the use of the antipsychotic medication at that time, the defendant was then determined to be legally competent. Therefore, the court finds that the basis of Dr. Cotterell's opinion lacks sufficient detail and

supporting information to justify a finding that the use of the antipsychotic medication will "substantially likely" or "to a reasonable degree of medical certainty" render the defendant competent to stand trial.

While the due process clause and the statutory requirement do not condition an order permitting involuntary medication of a defendant on a psychiatric guarantee of success, they require far more than it is "worth a try." See, e.g., *State* v. *Lopes*, 355 Or. 72, 101–103, 322 P.3d 512 (2014) (evidence adduced gave the court pause since psychiatrist recommended involuntary administration of antipsychotic medication to restore defendant to competency because in his opinion, "the medications were 'worth trying' "; there is a difference between medication that is "worth trying" and medication that meets the *Sell* standard). This court finds that Dr. Cotterell's testimony on this issue was loose and equivocal, such that this court cannot find that the state has proven this factor by clear and convincing evidence either under the *Sell* standard (forced medication is *substantially likely* to render the defendant competent to stand trial), *or* under the statutory standard ("[t]o a *reasonable* degree of medical *certainty*, involuntary medication of the defendant will render the defendant competent to stand trial" [emphasis added]).

The second part of this particular *Sell* factor—that is, whether involuntary medication will further the state's interest in prosecuting the defendant, requires the court to consider whether the administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. This factor correlates in part to subparagraph (C) of § 54-56d (k) (2), that is, whether "the proposed treatment plan is narrowly tailored to minimize intrusion on the defendant's liberty and privacy interests . . . ."

The Connecticut Supreme Court has recognized that the standard applied in Connecticut prior to *Sell* was limited to a consideration of the defendant's liberty and privacy rights, while the *Sell* standard requires the consideration of a defendant's fair trial rights. See generally *State* v. *Jacobs*, supra, 265 Conn. 399–400. The court concluded that the *Sell* standard, including the consideration of a defendant's fair trial rights, governs the issue of involuntarily medicating a defendant so that defendant may be restored to competence to stand trial. Id.

In *Sell*, the Supreme Court observed that "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence . . . ." (Citation omitted.) *Sell* v. *United States*, supra, 539 U.S. 185; see also *United States* v. *Grigsby*, 712 F.3d 964, 974 (6th Cir. 2013) ("[f]orcibly medicating a defendant with psychotropic drugs can burden fair trial rights by affecting the defendant's capacity to comprehend and react to trial events, consult with counsel, testify, and control his behavior in front of the jury"). In addressing the impact of a medication's side effects on a defendant's fair trial rights, *Sell* cites Justice Kennedy's concurring opinion in *Riggins* v. *Nevada*, 504 U.S. 127, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992). See *Sell* v. *United States*, supra, 179.

Justice Kennedy expressed his concern that the side effects of antipsychotic medication can compromise "the right of a medicated criminal defendant to receive a fair trial." *Riggins* v. *Nevada*, supra, 504 U.S. 142. He made the following observations: "The drugs can prejudice the accused in two principal ways: (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and

(2) by rendering him unable or unwilling to assist counsel. It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. . . . At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. . . . The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense. Serious due process concerns are implicated when the State manipulates the evidence in this way. The defendant may be restless and unable to sit still. . . . The drugs can induce a condition called parkinsonism, which, like Parkinson's disease, is characterized by tremor of the limbs, diminished range of facial expression, or slowed functions, such as speech. . . . Some of the side effects are more subtle. Antipsychotic drugs . . . can have a 'sedation-like effect' that in severe cases may affect thought processes. . . . These potential side effects would be disturbing for any patient; but when the patient is a criminal defendant who is going to stand trial, the documented probability of side effects seems to me to render involuntary administration of the drugs by prosecuting officials unacceptable absent a showing by the State that the side effects will not alter the defendant's reactions or diminish his capacity to assist counsel." (Citations omitted.) Id., 142–43.

These concerns for the potential unfairness to the defendant cannot be understated in this case. Dr. Cotterell testified that both of the medications have notable side effects. The use of Haloperidol can result in dizziness, headaches, the development of persistent motor problems expressed by tics and tremors, an increase or decrease in blood pressure, constipation, sleepiness,

cognitive impairment such as the slowing of thought processes and a sense of restlessness such that the person cannot sit still. Similarly, notable potential side effects as a result of using Olanzapine include dizziness, dry mouth, lowering of blood pressure, increased heart rate, weight gain, increased blood sugar levels, joint pain, constipation and an increased rate of sedation.

Dr. Cotterell agreed that the use of these antipsychotic medications can be sedating, which would make it harder for someone to assist in their own defense. Likewise, he admitted that this medication also can result in someone feeling jittery and restless, which could then impact their ability to concentrate and participate in their defense. In light of this testimony, the court finds that the state did not establish by clear and convincing evidence that administration of these drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in preparing for trial and at trial, as well as have an impact on the defendant's courtroom presentation.

3

Alternative Treatments

*Sell*'s third consideration, the necessity of the treatment proposed, requires the court to "find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." This factor correlates to subparagraph (B) of § 54-56d (k) (2), namely, "an adjudication of guilt or innocence cannot be had using less intrusive means . . . ."

Ms. Devine detailed the failed efforts made by the treatment team at CVH to restore the defendant to competency by less intrusive means (other than medication) such as intensive psychoeducation, individual psychotherapy, groups to address competency education,

stress management, community re-entry and recovery group. See Hearing Exhibit 2, pp. 7–8. Thus, the court finds that the state has sustained its burden of proving by clear and convincing evidence that less intrusive treatments other than forced medication have been tried, but those other treatments have not been successful and are not likely to achieve substantially the same results. In other words, an adjudication of guilt or innocence cannot be had using less intrusive means other than forced medication.

### 4

### Medical Appropriateness

The final *Sell* factor requires the court to determine whether the proposed treatment is "medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." This factor correlates in part to subparagraph (D) of § 54-56d (k) (2), namely, "the proposed drug regimen will not cause an unnecessary risk to the defendant's health . . . ."

This court credits the testimony of Ms. Devine that the proposed medical treatment is in the defendant's best medical interest in light of the defendant's medical condition. As noted by Ms. Devine in hearing exhibit 2, the defendant is "acutely psychiatrically ill with bizarre delusions, and auditory hallucinations. She is experiencing significant distress. . . . Psychiatric medications, at a therapeutic level, will likely improve substantially her level of functioning, allowing her to participate with staff in her care and treatment and afford her an opportunity to achieve greater stability." Further, while both Dr. Cotterell and Ms. Devine noted the reported side effects for psychiatric medications, "the defendant is in an acute hospital setting where she will be monitored continuously by trained staff." See Hearing Exhibit 2.

Thus, the court finds that the state has sustained its burden of proving by clear and convincing evidence that the proposed treatment is in the defendant's actual best health interest and "the proposed drug regimen will not cause an unnecessary risk to the defendant's health . . . ."

## III

## CONCLUSION

"[T]he forcible administration of drugs necessarily requires a substantial and degrading intrusion of the body." *United States* v. *White*, 620 F.3d 401, 422 (4th Cir. 2010) (Keenan, J., concurring). Thus, as the Supreme Court indicated in *Sell*, forcible medication is justified only in exceptional cases and counseled trial courts to ask: "Has the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?" *Sell* v. *United States*, supra, 539 U.S. 183. For the reasons stated above, the answer is no.

The state's request to allow the defendant to be administered psychiatric medication involuntarily is denied.